UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VEKOMA RIDES ENGINEERING
B.V.,

    Plaintiff,

v.   Case No: 6:24-cv-639-JSS-DCI

BOLLIGER & MABILLARD
CONSULTING ENGINEERS, INC.,

    Defendant.
_____/

## ORDER

Plaintiff sues Defendant under the Patent Act, 35 U.S.C. §§ 1–390, for the alleged infringement of a utility patent for a stand-up roller coaster: United States Patent Number 7,987,793. (*See* Dkt. 2.) After receiving briefing from the parties, the court held a claim construction hearing on June 23, 2025, regarding six disputed claim terms. (*See* Dkts. 46 to 51.) Upon consideration, for the reasons outlined below, the court construes the terms as set forth herein.

## BACKGROUND

The United States Patent and Trademark Office (USPTO) issued the patent to Plaintiff on August 2, 2011. (Dkt. 2 at 19.) Plaintiff alleges that the patented invention allows passengers on a stand-up roller coaster to create exciting, personalized ride experiences by permitting the passengers to squat and stand during the ride while torso restraints secure the passengers and the platform in the carriage portion of the roller coaster supports their feet. (*Id.* at 4, 7.) Plaintiff further alleges that in October 2022, the SeaWorld Orlando theme park introduced a new roller coaster named Pipeline

that "apparent[ly] refer[red] to passengers' ability to squat and stand during the ride." (*Id.* at 4.) Pipeline reportedly opened to the public in May 2023 and is still operating. (*Id.* at 5–6.) Plaintiff claims that Pipeline infringes on its patent. (*Id.* at 6–15.) Plaintiff seeks declaratory, injunctive, and monetary relief for the alleged infringement. (*Id.* at 16.) In response, Defendant denies liability, asserts affirmative defenses, and countersues for declarations that it has not infringed the patent and that the patent is invalid. (*See* Dkt. 34.) In its claim construction brief, Defendant challenges the validity of the patent claim by arguing that certain claim terms are indefinite. (*See* Dkt. 49 at 12, 18–20, 24, 26–32.)

## APPLICABLE STANDARDS

The patent claim defines the protected invention for the patentholder, *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004), and "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it," *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). When construing a claim, the court examines intrinsic evidence before turning to extrinsic evidence if necessary. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the patent claims themselves, the patent specification, and the prosecution history with the USPTO. *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning"—that is, "the meaning that the term would have to a person of ordinary skill in the art in question . . . as of the effective filing date of the patent application."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (quotation omitted). "If the claim language is clear on its face," the court considers only "if a deviation from the clear language of the claims is specified": for example, if the patentholder has decided to "use terms in a manner other than their ordinary meaning" or has "relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quotations omitted and alteration adopted). If the claim language is not clear on its face, the court "resolv[es], if possible, the lack of clarity." *Id.*

Courts consult a patent "specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention, and not merely to limit a claim term." *Id.* at 1332 (quotation omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. The USPTO "determines the scope of claims in patent applications not solely on the basis of the claim language, but upon giving claims their broadest reasonable construction 'in light of the specification as it would be interpreted by one of ordinary skill in the art.'" *Id.* at 1316 (quoting *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004)).

A claim's prosecution history is "the complete record of all the proceedings before the [USPTO], including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582. "Like the

specification, the prosecution history provides evidence of how the [US]PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "Yet because the prosecution history represents an ongoing negotiation between the [US]PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

"[I]t is improper to rely on extrinsic evidence" when intrinsic evidence resolves the ambiguity in a disputed claim term. *Vitronics*, 90 F.3d at 1583. However, when intrinsic evidence does not resolve the ambiguity, courts consult extrinsic evidence such as "expert testimony, dictionaries, and treatises." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1362 (Fed. Cir. 2014). Courts consider any extrinsic evidence "in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

## ANALYSIS

The parties dispute the following terms: "standing position," "squatting position," "movements between the standing position and a squatting position," "safely supporting the passenger in at least the standing position," "during the ride," and "connecting means." (Dkt. 50 at 1–2.)

As to the terms "standing position," "squatting position," "safely supporting the passenger in at least the standing position," and "during the ride," Plaintiff contends that construction is unnecessary. (Dkt. 47 at 13, 26, 28–29.) In contrast, Defendant defines "standing position" as "a position in which the body is upright, the feet are on the ground, the body is supported only by the feet, and the legs are substantially straight" and "during the ride" as "throughout the duration of time

between when the carriage begins moving and when the carriage comes to a final stop." (Dkt. 49 at 13, 32.)  Defendant further asserts that "squatting position" is an indefinite term and that the word "safely" in "safely supporting the passenger in at least the standing position" also renders that term indefinite. (*Id.* at 18–19, 26.)  With one exception, "during the ride," the court agrees with Plaintiff that these terms do not require construction.  Regarding the terms "squatting position" and "standing position," for example, Figures 3B and 3C of the patent specification show a passenger in squatting and standing positions, respectively, (Dkt. 2 at 25), and the pictured positions align with the ordinary meanings of those terms. *See I/P Engine, Inc. v. AOL, Inc.*, 874 F. Supp. 2d 510, 516 (E.D. Va. 2012) ("[T]he [c]ourt need not provide a new definition or rewrite a term when the [c]ourt finds the term's plain and ordinary meaning is sufficient.").  In the roller-coaster context, the ordinary meaning of "safely"—and "safely supporting the passenger in at least the standing position"—also suffices. *See id.*  However, with respect to "during the ride," ambiguity may arise respecting whether the term includes the embarkation and disembarkation periods when passengers are getting on and off the roller coaster.  The parties agreed at the claim construction hearing that the term "during the ride" does not include those periods.  Defendant's definition reflects this limitation, but Plaintiff opposes the definition arguing that the phrase "throughout the duration" implies "throughout the entire duration" and something can occur at some point "during the ride" without occurring "throughout the entire duration" of the ride. (Dkt. 47 at 29–30.)  The court resolves this dispute by modifying Defendant's definition.  Accordingly, the court

construes "during the ride" as "during the time between when the carriage begins moving and when the carriage comes to a final stop."

As to the term "movements between the standing position and a squatting position," Plaintiff offers the definition "movements capable of being performed by a passenger within a range from standing and squatting," (Dkt. 47 at 24), whereas Defendant maintains that the phrase "squatting position" renders the term indefinite but alternatively offers the definition "movements starting from the standing position and ending at a squatting position," (Dkt. 49 at 28–29). Plaintiff criticizes Defendant's definition as reading unsupported limitations into the claim language. (Dkt. 47 at 25.) The court agrees. Claim language describes the invention as "allow[ing] the passenger to perform movements between the standing position and a squatting position during the ride . . . wherein the torso restraint performs an up and down movement with respect to the platform during said movements of the passenger." (Dkt. 2 at 36–37.) According to the patent specification, the invention accordingly "enables the passenger to be restrained" on the ride "while being able to squat for waves, tunnels," and the like "while the carriage moves along the track performing" roller-coaster maneuvers. (*Id.* at 31.) In this context, passenger movements between standing and squatting include passenger movements from standing to squatting and back to standing again, which relative to the platform, entail "up and down movement" overall, rather than just upward or just downward movement. If movements from standing to squatting and back to standing again are movements starting from the standing position and ending at the standing position, then those movements do not

qualify as "movements between the standing position and a squatting position" under Defendant's definition because they do not end at a squatting position. Even if the movements are divided into two stages—from standing to squatting and from squatting back to standing—only the first stage would fit Defendant's definition; the second stage would be excluded. In the context of standing and squatting during a roller-coaster ride, Plaintiff's definition better accounts for the range of passenger movements described in the intrinsic evidence. Accordingly, the court construes "movements between the standing position and a squatting position" as "movements capable of being performed by a passenger within a range from standing and squatting."

As to the term "connecting means," the parties agree that the court must conduct a means-plus-function analysis. (*See* Dkt. 47 at 19–24; Dkt. 49 at 21–26.) *See* 35 U.S.C. § 112 ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").[1] Indeed, "[b]ecause the term '[connecting] means' uses the word 'means,' it is presumptively subject to" this analysis. *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1120 (Fed. Cir. 2001).

---

[1] The Leahy-Smith America Invents Act (AIA) renamed 35 U.S.C. § 112 ¶ 6 as § 112(f) and added a title for the subsection but did not otherwise change the subsection's language; nonetheless, because the application for the patent at issue was filed before September 16, 2012, the court refers to the pre-AIA version of § 112. *See Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377, 1379 n.1 (Fed. Cir. 2025).

"Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015) (en banc in part) (citation omitted). "This inquiry is undertaken from the perspective of a person of ordinary skill in the art." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).

"The function of a means-plus-function limitation . . . must come from the claim language itself." *Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002). Here, the parties generally agree that the functions of the connecting means are to connect the torso restraint to the transport part of the roller coaster, to allow movement of the torso restraint with respect to the platform, and to permit the passenger to perform movements between the standing position and a squatting position during the ride. (*See* Dkt. 47 at 22–23; Dkt. 49 at 23.) Claim language confirms these functions. (*See* Dkt. 2 at 36 ("[C]onnecting means . . . connect[] the passenger torso restraint to the transport part[.] . . . [C]onnecting means allow[] a movement of the torso restraint with respect to the platform[.] . . . [C]onnecting means . . . allow the passenger to perform movements between the standing position and a squatting position during the ride . . . .").) However, Defendant also proposes another function, arguing that the connecting means specifically allow passenger movements in such a way that the torso restraint performs an up and down movement with respect to the platform during the passenger movements. (Dkt. 49 at 23.) Defendant derives this function from a

wherein clause in the claim language. (*See* Dkt. 2 at 36–37 ("[C]onnecting means . . . allow the passenger to perform movements between the standing position and a squatting position during the ride while being restrained by the torso restraint, *wherein the torso restraint performs an up and down movement with respect to the platform during said movements of the passenger*." (emphasis added)).)

"Sometimes phrases beginning with . . . 'wherein[]' . . . are deemed part of the means-plus-function elements and sometimes they are not." *King Pharms., Inc. v. Purdue Pharma L.P.*, 718 F. Supp. 2d 703, 712 (W.D. Va. 2010) (discussing cases). The court must determine whether the wherein clause describes a function or "merely states the result of the limitations in the claim" while adding "nothing to the substance of the claim." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). Here, after examining the intrinsic evidence, the court agrees with Defendant that the clause describes a function—one comparable to the other functions that the parties have jointly identified for the "connecting means" term. Although the primary function of the connecting means is to connect, the connecting means do not just connect; they connect in a particular way that allows for certain necessary movements. *Cf. ABP Patent Holding, LLC v. Convergent Label Tech., Inc.*, 194 F. Supp. 2d 1257, 1264–66 (M.D. Fla. 2002) (performing a means-plus-function analysis for a patent claim involving forms for pharmacy labels, noting the claim language "means for connecting said labels such that . . . the removal of one of the labels from the backing sheet will simultaneously remove from the backing sheet the other label to which it is connected[] and . . . the two removed labels optionally may be readily

separated from each other prior to affixing any of said labels to said container," and explaining that this language "makes it clear that the function . . . is to allow the removal of pharmacy labels so that the removal of one label from the backing sheet will simultaneously remove another label[] and so that the two labels can be readily separated from each other before being affixed to the prescription bottle"); *Mahurkar v. Arrow Int'l, Inc.*, 160 F. Supp. 2d 927, 950–51 (N.D. Ill. 2001) (in the context of a catheter, concluding that the function in the means-plus-function analysis for the term "connecting means" was not only "connecting to the proximal end of that portion of the assembly that is inserted into the patient's body" but also "forming a pair of internal passageways which communicate at one end thereof with the dual lumens in the catheter" when the claim mentioned "connecting means attached to the proximal end of said catheter and forming a pair of internal passageways which communicate at one end thereof with the dual lumens in said catheter"). Accordingly, the court adopts Defendant's description of the functions for the term.

"Where there are multiple claimed functions, as . . . here, the patent[holder] must disclose adequate corresponding structure to perform all of the claimed functions." *Williamson*, 792 F.3d at 1351–52. "Structure disclosed in [a patent] specification qualifies as 'corresponding structure' [for a function] if the intrinsic evidence clearly links or associates that structure to the function . . . ." *Id.* at 1352. "The specification must be read as a whole to determine the structure capable of performing the claimed function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379 (Fed. Cir. 2001). "While corresponding structure need not include all things necessary

to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005); *see Robinson v. Advanced Decoy Research, Inc.*, 519 F. Supp. 2d 1087, 1105 (S.D. Cal. 2007) (explaining that although a hollow tube could not be the structure for the connecting means because the tube "d[id] not itself provide a means for connection," the combination of the tube and a loop constituted the structure because the tube and loop "work[ed] in conjunction" to connect).

In the table submitted with the parties' joint prehearing statement, Plaintiff lists ten structures for the connecting means:

[1.] a guide structure arranged on the transport part[;]

[2.] a guide part connected to the torso restraint to be guided along the guide structure, the guide part comprising a hinge[;]

[3.] a curved guide structure and a hinge[;]

[4.] springs, (flexible[)] rods[, and] pistons[;]

[5.] four guide structures[;]

[6.] guide structures comprising guide parts and hinges[;]

[7.] pistons and rods, and optionally dampers or gas springs[;]

[8. a] U-shaped frame to which two tubular-shaped hollow guide structures are connected, various guide parts connected to the torso restraint, and a cylinder, possibly a hydraulic cylinder, to damper the motion of the passenger[;]

[9.] a column placed on a platform, and a double-wishbone construction comprising rods, plates, diagonal dampers, [and] a horizontal damper[,] all pivotable on a pivot axis[; and]

[10. a] connection plate and guide structure[.]

(Dkt. 50 at 6–7.) In contrast, Defendant lists seven structures, each corresponding to a figure (or set of related figures) in the patent specification:

> 1. [a] guide structure and a guide part to be guided along the guide structure in a substantially vertical direction; the guide structure is connected to a frame part onto which all elements of the torso restraint are mounted; a hinge between the guide part and the frame part that allows a forward rotational movement of the torso restraint about the hinge, enabling a forward rotation of the trunk or torso of the passenger during the ride while being restrained by the torso restraint, arranged as depicted in Fig[ures] 1A, 1B[,] and 1C[;]
>
> 2. [f]our guide structures and a guide part which is guided along each guide structure; the guide part is connected to a frame part onto which elements of the torso restraint are mounted; hinges between the guide part and the frame part allow for a forward rotational movement of the torso restraint about this hinge, allowing a forward rotation of the trunk of the passenger, arranged as depicted in Fig[ures] 2A, 2B, 2C[,] and 2D[;]
>
> 3. [p]istons, possible dampeners or gas springs, and rods arranged as depicted in Fig[ures] 3A, 3B[,] and 3C[;]
>
> 4. [a] U-shaped frame part to which two tubular-shaped hollow guide structures are connected, with guide parts connected to a torso restraint that can be guided along the guide structure to allow an up and down movement of the torso restraint with respect to the platform and to allow the passenger to perform movements during the ride between a standing position and a squatting position while being restrained by the torso restraint, arranged as depicted in Fig[ure] 4[;]
>
> 5. [r]ods, plates, two diagonal dampers and a horizontal damper, all pivotable about pivot axes and arranged in a "double wishbone" construction, where the horizontal damper can be used to adjust the connecting means to the height of the passenger and the two diagonal dampers allow for a vertical movement of the passenger, arranged as depicted in Fig[ure] 5[;]
>
> 6. [a] semicircular guide structure as depicted in Fig[ure] 6[; and]
>
> 7. [a] connection plate and a guide structure; the guide structure connects the torso restraint to the transport part and is designed to allow the passenger to perform a squatting movement of the legs during the ride

> while being restrained by the torso restraint, and the torso restraint performs an up and down movement with respect to the platform during the squatting movements of the passenger, arranged as depicted in Fig[ure] 7.

(*Id.* at 6–9.)

Each list finds colorable support in the specification. (*See* Dkt. 2 at 19–37.) However, Defendant's list improperly requires structures "arranged as depicted in" the specification's figures, (Dkt. 50 at 6–9), when according to the specification, these figures merely depict preferred and alternative embodiments of the patented invention, (Dkt. 2 at 33). "[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). Consequently, the court adopts Plaintiff's list of structures for the connecting means. *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) ("While the specification must contain structure linked to claimed means, this is not a high bar: all one needs to do . . . is to recite some structure corresponding to the means in the specification . . . ." (alteration adopted and quotation omitted)). Defendant contends that Plaintiff's list includes structures, such as a guide structure arranged on the transport part, that cannot perform any of the claimed functions. (Dkt. 49 at 25–26.) The court disagrees. For example, Figures 1A, 1B, and 1C illustrate how a guide structure arranged on the transport part can fulfill the connecting function. (*See* Dkt. 2 at 20, 33.) The court thus construes the term "connecting means" as encompassing the structures in Plaintiff's list.

## CONCLUSION

Accordingly, the six disputed claim terms are construed as set forth in this order. The court's construction of the terms is without prejudice to Defendant's ability to challenge the validity of the claim for indefiniteness later in this case. *See Proslide Tech., Inc. v. Whitewater W. Indus., Ltd.*, No. 6:20-cv-2189-CEM-DCI, 2022 WL 19336339, 2022 U.S. Dist. LEXIS 240813 (M.D. Fla. Apr. 28, 2022); *see also Omnia Med., LLC v. PainTEQ, LLC*, No. 8:22-cv-145-VMC-TGW, 2023 WL 4305224, at *9, 2023 U.S. Dist. LEXIS 113886, at *25 (M.D. Fla. June 30, 2023) ("While indefiniteness challenges are linked to claim construction because a court must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, courts are not required to determine indefiniteness during claim construction proceedings." (quotation omitted and alteration adopted)).

**ORDERED** in Orlando, Florida, on July 1, 2025.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record